HILL *et al. vs.* ARNOLD, administrator, *et al.*[*]

1. Courts of equity are slow and cautious about appointing receivers to take charge of the assets of an estate in the hands of an administrator legally appointed; but if an administrator is seeking to administer property, the title to which clearly appears to be in another, then a receiver should be appointed, if the circumstances indicate that the rights of all the parties would thereby be more effectually and expeditiously protected and enforced.

2. If L. M. Hill, the testator, designated L. Harry Hill as his legatee with the intention and for the purpose of his holding the legacy as a trustee for B. P. Hill, such intention must be gathered from the will, the circumstances attending its execution, and the agreement between the parties of March 14, 1882. If such a trust was intended and created, it must have been induced by and based on the insolvency of B. P. Hill, his consent given, and the promises made by L. Harry Hill in said agreement, the record disclosing no other inducment for the trust and no other source from which to ascertain the terms and extent thereof.

3. Where, by the terms of the agreement, L. Harry Hill was to have $10,000 out of the legacy, and after this he was bound to "turn over all of the residuary of said legacy and apply the same in whatever manner B. P. Hill might dictate," if the legatee held as trustee, the extent of his power as such was to turn over and apply the residuum of the legacy, and this carried with it the right to convey the full title of any part or all of the balance thereof, with the consent or dictation of the beneficiary.

4. Where, after the death of the testator, a contract was entered into with the consent and for the mutual benefit of L. Harry Hill and B. P. Hill, in which it was agreed that the former should take out of his legacy enough to pay his indebtedness and certain named stocks and bonds amounting to $10,000, and then that "all the balance of the interest of L. Harry Hill in the estate of L. M. Hill, deceased, is to be transferred to D. C. Hill, to be by him held for the use and benefit of B. P. Hill, with the following conditions:

BLECKLEY, C. J., being disqualified, Judge BOYNTON, of the Flint circuit, was appointed to preside in his stead.

L. Harry Hill grants to B. P. Hill the right to manage, control and dispose of the Taylor place in any way that to him may seem best and proper:

*Held,* that the language in reference to the Taylor place, without qualifying words, or other covenants limiting it, would be sufficient to vest a fee in B. P. Hill; but when taken in connection with the previous stipulation, and the subsequent one that "in case of the death of B. P. Hill without marriage and further issue, the whole of the property held by D. C. Hill for use of B. P. Hill is to be conveyed to L. Harry Hill," it is clear that B. P. Hill took less than a fee in the Taylor place; and it may be legitimately concluded that B. P. Hill consented to and directed the transfer of that place to D. C. Hill, and his right to manage and control it was subordinate to the legal title vested in the transferee, and his power of disposal was limited by his consent for D. C. Hill to hold the title, with the right and power to convey to L. Harry Hill in case he died without issue.

5. Where, pursuant to this agreement, the Taylor place was conveyed to D. C. Hill, and B. P. Hill died without further issue, he did not have a fee in the property, and if a trust was created in his favor in the legacy, it was executed, so far as his rights and those of his administrator and heirs are concerned, by the second contract and the conveyance of title to D. C. Hill.

(*a*) The chancellor therefore erred in not appointing a receiver to take charge of so much of the property in controversy, including the Taylor place, as was conveyed to D. C. Hill by the deed from L. Harry Hill.

6. The crops made on the Taylor place while under the management of B. P. Hill, and property purchased with the proceeds of the crops, or from the income arising from the personal assets mentioned in the deed, which were delivered to B. P. Hill, and also the three horses, the buggy, wagon and harness mentioned in the record, are assets belonging to his estate subject to administration.

December 3, 1887.

Administrators and Executors. Trusts and Trustees. Receivers. Injunction. Title. Wills. Contracts. Before Judge LUMPKIN. Oglethorpe County. At Chambers, April 2, 1887.

Reported in the decision.

HENRY JACKSON; B. S. IRWIN; J. T. OLIVE, for plaintiffs in error.

W. M. Howard; Hamilton McWhorter, for defendants.

Boynton, Judge.

This cause comes before this court on a bill of exceptions, sued out at the instance of plaintiff in error, alleging that the chancellor erred in refusing to appoint a receiver to take charge of certain real and personal property which Arnold was seeking to administer as the property, of B. P. Hill, deceased. An abstract of the facts necessary for a clear understanding of the points decided is as follow:

On the 13th of February, 1882, L. M. Hill made a will, in which he devised to his son, B. P. Hill, a child's part of his estate, and a part of his legacy was the tract of land known as the "Taylor place," now in controversy. On the 14th of March, 1882, B. P. Hill, and his son, L. Harry Hill, entered into an agreement by which L. Harry Hill covenanted, in consideration of B. P. Hill's consenting for L. M. Hill to will to L. Harry Hill B. P. Hill's interest in the estate of L. M. Hill, and for the further consideration of B. P. Hill's giving L. Harry Hill ten thousand dollars out of said legacy, then L. Harry Hill bound himself "to turn over all of the residuary of said legacy and apply the same in whatever manner the said B. P. Hill might dictate." And L. Harry also further agreed "to make a will and give the ten thousand dollars he received to D. C. Hill, with the understanding that D. C. Hill hold the same subject to the disposal of B. P. Hill," and the writing recites: "D. C. Hill herein agreeing to abide the same."

D. C. Hill, in an affidavit, says of this contract, "that L. M. Hill, the testator, had stated to him his intention to convey a share in his estate to the said Harry, instead of to said B. P. Hill, for the reason that there were outstanding executions against said B. P. Hill that would sweep away said property if left to him; and when subsequently he exhibited said agreement to said testator, he simply re-

v 79-24

marked, " Well, that's no account; it can't bind Harry by law." Bessie May Hill in her answer alleges that " D. C. Hill told her he drew the agreement of L. Harry Hill of March 14th, 1882, and was a witness to the same, and that he carried said paper to his father, L. M. Hill, for his approval, and gave it to him, and that only a few days thereafter the said L. M. Hill made and executed a codicil to his will, making the said L. Harry Hill his legatee instead of his father, Burwell P., as was agreed that the said L. M. should do."

On the 17th March, 1882, L. M. Hill, by a codicil to his will, revoked the bequest made to B. P. Hill, and by the codicil devised the child's share of his estate bequeathed to B. P. Hill in his will, to L. Harry Hill, and required him to account for all of the advancements made either to himself or to B. P. Hill.

L. M. Hill died October 13th, 1883, and on November 17th, 1883, B. P. Hill and L. Harry Hill made another contract, in which it is stipulated " that, whereas L. M. Hill, deceased, did, in his will, leave L. Harry Hill his legatee in the stead of B. P. Hill, now, for our mutual benefit, we make this agreement": Out of the legacy L. Harry was to pay all of his indebtedness and take certain named bonds and stocks amounting to ten thousand dollars. Then, " All the balance of the interest of L. Harry Hill in the estate of L. M. Hill, deceased, is to be transferred to D. C. Hill, to be by him held for the use and benefit of B. P. Hill, with the following conditions: L. Harry Hill grants to B. P. Hill the right to manage, control and dispose of the ' Taylor place ' in any way that to him may seem best and proper. The balance of the interest in the estate of L. M. Hill is to be held by D. C. Hill, as above stated, the proceeds or income to be subject at all times to the order of the said B. P. Hill, the principal not to be disposed of except by the mutual agreement of B. P. Hill and L. Harry Hill. In case of the death of B. P. Hill without marriage and further issue, the whole of the property held by D. C.

Hill for the use of B. P. Hill is to be conveyed to L. Harry Hill, and in case of the death of L. Harry Hill without marriage and issue, the whole of his property is to be transferred to D. C. Hill for the use of B. P. Hill, to be held by him same as the above property, except, in such an event, the whole is subject to the order of B. P. Hill unconditionally."

And on the 16th day of January, 1884, L. Harry Hill executed and delivered a deed conveying to D. C. Hill the "Taylor place; also all my undivided interest in the Bank of Washington, and notes belonging to the estate of L. M. Hill, deceased; all of which was willed to me by my grandfather, L. M. Hill. I also give to the said Duncan C. Hill my horses, Dock, Mack and George, and my mare, Carmen; one good top-buggy and harness; one new two-horse wagon and harness."

B. P. Hill was insolvent in 1882. There were outstanding against him three executions for large amounts, and the same were unpaid at the time of his death. He intermarried with Bessie May Taylor, May 7th, 1884, and died without issue by this marriage. B. P. Hill was in possession of the Taylor place in the fall of 1883, and continued in possession and control of same until his death, December 12th, 1886. He ran the farms on the place in his own name, in most instances contracting with laborers, tenants and croppers in his own name; and in 1884 he made repairs on the houses and built a new dwelling-house on the place, purchasing in his own name and paying for same, and on many occasions, and to various persons, he claimed the place as his.

In February, 1887, James W. Arnold, Sr., was appointed administrator of B. P. Hill, and caused an appraisement to be made in which was included the "Taylor place," the stock, farming implements, wagons, buggies and crop, and other articles of personal property on the place, and was proceeding to sell some of the stock, when, in April, 1887, D. C. Hill filed a bill against him, R. S. Taylor,

Bessie May Hill and L. Harry Hill, alleging, among other
things, that all the property included in the appraisement,
with some unimportant exceptions, belonged to him, and
that he had absolute title to the same, which he acquired
under the deed from L. Harry Hill; that some of the
personal property was purchased by B. P. Hill with the
income and proceeds of the property conveyed to him in
said deed; that R. S. Taylor and Mrs. Bessie May Hill
were in possession of the farm and interfered with the
tenants thereon, and prevented him, by their interference,
from having other parts of the farm cultivated; that Mrs.
Hill was quite young and knew nothing about carrying on
a farm; and that Taylor was a man of violent temper and
unfitted to control labor and manage a farm; and that said
Taylor and Mrs. Hill were insolvent, and the farm would
be wholly unproductive of profit, and no mense profits
could be recovered out of them if allowed to remain in
possession of the farm, and as they were in possession,
Arnold would not be liable to him for mesne profits.  He
also alleged that the title of this property passed to L.
Harry Hill by the will of L. M. Hill, and was conveyed to
him absolutely by said Harry; and under this conveyance
he went into possession and control of the same, either in
person or by an agent, and so continued in possession and
control until wrongfully dispossessed thereof by fraudu-
lently procuring said administration, and the fraudulent
confederation of said Arnold, Taylor and Mrs. Hill to claim
said property as belonging to the estate of B. P. Hill, de-
ceased; that his brother, B. P. Hill, was entirely insolvent,
and executions for large sums were outstanding against
him; and being desirous of aiding him, he had permitted
him to live on the place and cultivate the same; and that
L. Harry Hill was the only child of B. P. Hill and inter-
ested in the litigation.  The bill prayed for the appoint-
ment of a receiver to take charge of the real and personal
property sought to be administered by said Arnold, and
for an injunction restraining Arnold from selling any part

of said property and all the defendants from interfering with the control and possession of said property.

Defendants, Arnold, Taylor and Mrs. Hill, in their respective answers deny any and all fraud in obtaining the administration and all confederation to improperly retain possession of the property ; and set up title in B. P. Hill at time of his death to the Taylor place and all the personal property; and say that the agreement of Harry Hill of March 14, 1882, was an arrangement by which L. Harry was to become the nominal legatee under the will of L. M. Hill; that the share of the estate received by him was to belong absolutely to B. P. Hill; that L. Harry conveyed the Taylor place to B. P. Hill in the contract of November 17, 1883, with absolute power of disposal annexed, and B. P. Hill thereby became seized and possessed in his own right of the fee in the Taylor place; that L. Harry Hill never acquired any beneficial interest in the property devised to him; that the deed to D. C. Hill by Harry was made in pursuance of former contracts for the use and benefit of B. P. Hill, and he being *sui juris*, the title vested in him; and that B. P. Hill took possession and managed the place as his own property, contracted with laborers and tenants, raised crops and sold them as his own, bought stock, wagons, etc. with the income, and loaned L. Harry Hill $2,600.00, on which small credits had been made for stock purchased from Harry.

An answer was filed by L. Harry Hill, in which he admitted the material allegations in the bill, the execution of the contracts and deed referred to ; and alleged that these were executed in good faith, in order to give his father an independent support out of the income ; that there was no intention in any of these agreements to convey any of the property to B P Hill  that he never intended and never did create any title in said B. P. Hill; that he never held as trustee for B. P. Hill and never created any trust in his behalf by any of the agreements; the conveyance to D. C. Hill was absolute, trusting to his known integrity to

provide for B. P. Hill and afterward make such disposition of the property as he deemed just. He also claims, if the property is not decreed to be D. C. Hill's, that he is entitled to it under the contract of November 17, 1883, and prays for a decree in his favor.

D. C. Hill says that he furnished B. P. Hill with money to build the house, and allowed him to manage the farm in his own name, in order that he might better control labor, and that B. P. Hill always recognized his title to the property and his right to control same. At one time, when the Taylor place was levied on and advertised for sale, B. P. Hill said to a lawyer that the property did not belong to him, and requested him to communicate with D. C. Hill, to whom the property belonged, with a view of interposing a claim.

It was admitted that D. C. Hill gave in the real and personal property for taxation, and that B. P. Hill did not give in any property for tax for the years 1884–5–6.

On the hearing, the chancellor granted the injunction, restraining the administrators of B. P. Hill from selling the personal property, but refused to appoint a receiver; and to this refusal D. C. Hill excepted and assigns the same as error.

1. Courts of equity are slow and cautious about appointing receivers to take charge of the assets of an estate in the hands of an administrator legally appointed. But if an administrator is seeking to administer property, the title of which clearly appears to be in another, then a receiver should be appointed, if the circumstances indicate that the rights of all the parties would thereby be more effectually and expeditiously protected and enforced. We therefore hold, that the propriety of appointing a receiver in this case depends largely on the answer to the question, to whom does the property brought into controversy by the pleadings belong? Defendants in error insist that B. P. Hill, deceased, was the owner thereof, because L. Harry Hill was merely the nominal legatee under the will of L.

M. Hill, and that he held the legacy as a trustee for B. P. Hill, and the *cestui que* trust being *sui juris*, the title to the legacy vested absolutely in him.

2, 3, 4. If L. M. Hill designated L. Harry as his legatee, with the intention and for the purpose of his holding the legacy as a trustee for B. P. Hill, such intention must be gathered from the will, the circumstances attending its execution and the agreement of March 14, 1882. If such a trust was intended and created, it must have been induced by and based on the insolvency of B. P. Hill, his consent given and the promises made by L. Harry in said agreement. The record discloses no other inducement for the trust and no other source from which to ascertain the terms and extent of such a trust, if intended. If these circumstances induced this change of the will, and the change was based on said agreement, then the rights of the parties are to be determined by the legal effect of that agreement, by the terms of which L. Harry was to have ten thousand dollars out of the legacy. About this there is no controversy. After taking this out, he was bound to " turn over all of the residuary of said legacy and apply the same in whatever manner B. P. Hill might dictate." If he held as trustee, the extent of his power as such was to " turn over and apply "; and this power carried with it the right to convey the full title of any part or all of the balance of the legacy. Certainly he could thus convey with the consent or dictation of B. P. Hill. Has the remainder of the legacy been turned over and applied according to the tenor of this agreement? If so, was it done by the parties authorized to make this disposition of it? On November 17, 1883, after the death of L. M. Hill, when the legal title was so far vested in L. Harry as to authorize him to dispose of the same in such manner, at least, as might be dictated by B. P. Hill, a contract was entered into with the consent and for the mutual benefit of both L. Harry and B. P. Hill, in which they agreed that L. Harry should take out of his legacy enough to pay his indebted-

ness; also certain named stocks and bonds amounting to ten thousand dollars, and then "all the balance of the interest of L. Harry Hill in the estate of L. M. Hill, deceased, is to be transferred to D. C. Hill to be by him held for the use and benefit of B. P. Hill, with the following conditions: "L. Harry Hill grants to B. P. Hill the right to manage, .control and dispose of the Taylor place in any way that to him may seem best and proper." This language in reference to the Taylor place, without qualifying words or other covenants limiting it, is sufficient to vest a fee in B. P. Hill (15 *Ga.* 457; 2 Kelly 307; 62 *Ga.* 144); but when taken in connection with the previous stipulation that "all the balance of the legacy" should be transferred to D. C. Hill, and the after stipulation, "In case of the death of B. P. Hill without marriage and further issue, the whole of the property held by D. C. Hill for use of B. P. Hill is to be conveyed to L. Harry Hill," it appears quite clear to us that B. P. Hill took less than a fee in the Taylor place. "All the balance of the interest of L. Harry Hill," used in the first instance, and the expression, "the whole of the property held by D. C. Hill," used in the latter stipulation, are both broad enough and evidently did include the Taylor place. Then it is legitimate to conclude that, by the terms of this agreement, B. P. Hill consented to and directed the transfer of the Taylor place to D. C. Hill, and his right to manage and control the same was subordinate to the legal title vested in D. C. Hill. And his power of disposal was limited by his consent for D. C. Hill to hold the title of the place with the right and power to convey to L. Harry in case he died without further issue. Pursuant to this agreement, L. Harry did, by the deed dated January 16, 1884, convey the Taylor place and the balance of his legacy to D. C. Hill, B. P. Hill having departed this life without further issue.

5. We hold that B. P. Hill never had a fee in the Taylor place, and if a trust was created in his favor in the legacy bequeathed to L. Harry—which question we do not de-

cide,—it was executed, so far as the rights of B. P. Hill and his administrator and heirs are concerned, by the contract of November 17, 1883, and the deed conveying title thereof to D. C. Hill. And therefore we decide, that the chancellor erred in not appointing a receiver to take charge of so much of the property in controversy, including the Taylor place, as was conveyed to D. C. Hill by the deed of January 16, 1884.

6. We are of the opinion that the crops made on the Taylor place while under the management of B. P. Hill, and property purchased with proceeds of crops, or from the income arising from the personal assets mentioned in that deed turned over to B. P. Hill, are assets belonging to his estate subject to administration. Also the three horses, buggy, wagon and harness mentioned in the record.

Judgment reversed.